**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **ROBERT J. SIRAGUSA M.D. EMPLOYEE** ) | |
| **TRUST (formerly known as Dermatology** ) | |
| **Association of Bay County, PA, Defined** ) | |
| **Benefit Plan), ROBERT J. SIRAGUSA,** ) | |
| **individually, DANA SIRAGUSA, and** ) | |
| **ROBERT JOSEPH SIRAGUSA,** ) | |
| ) | |
|     **Plaintiffs-Appellants** ) | |
|     **and Cross-Appellees,** ) | |
| ) | **No. 14 C 5008** |
|     **v.** ) | |
| ) | **Judge Jorge L. Alonso** |
| **ARTURO COLLAZO,** ) | |
| ) | |
|     **Defendant-Appellee** ) | |
|     **and Cross-Appellant.** ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs-Appellants Robert J. Siragusa M.D. Employee Trust, Dr. Robert J. Siragusa, Dana Siragusa and Robert Joseph Siragusa (collectively, "the Siragusas") appeal to this Court, pursuant to 28 U.S.C. § 158(a)(1), from a decision of the United States Bankruptcy Court holding that certain fraud claims the Siragusas may have against defendant-appellee Arturo Collazo based on debts he owes to them are not excepted from discharge under 11 U.S.C. § 523(a)(2)(A) in Collazo's bankruptcy proceedings. Collazo cross-appeals from the same decision, which held that certain other of the Siragusas' potential fraud claims *are* excepted from discharge. *See Siragusa v. Collazo (In re Collazo)*, Bankruptcy No. 12 B 44342, Adversary Proceeding 13 A 000216 (Bankr. N.D. Ill. Mar. 5, 2014) ("Opinion"). For the reasons stated below, the bankruptcy court's decision is affirmed.

## BACKGROUND

This case stems from numerous loans made by Dr. Robert Siragusa, his practice's pension plan and his children to business entities controlled by Arturo Collazo, the debtor in these bankruptcy proceedings. The Court adopts the relevant facts as set forth by the bankruptcy court in its March 5, 2014 Opinion.[1]  *See* Fed. R. Bankr. P. 8013 ("Findings of facts, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous.").

Julie Siragusa, one of Dr. Siragusa's daughters, was a real estate agent who worked with Collazo. Collazo was in the business of converting apartment buildings to condominiums and selling the converted units. Collazo and his business partner, Jon Goldman, would acquire an apartment building in the name of an LLC formed for the purpose of holding title to the various condominium units that would eventually be created from the apartments. Generally, each such LLC took the apartment building's address for its name. Collazo and Goldman were the sole members. They would obtain construction loans to finance the conversion of the buildings, and in return they would grant the lenders mortgages in the resulting condo units.

In 2002, Julie introduced her father to Collazo, and Dr. Siragusa sought to invest in some of Collazo's development projects. According to Dr. Siragusa, Collazo explained that he sometimes needed short-term financing to prevent construction delays because his principal construction lender often required an inspection of the premises before allowing him to draw on the construction loan. Dr. Siragusa's loans would provide this short-term financing, and Collazo agreed to pay Dr. Siragusa back, with 20% interest, from the sale of the converted condo units, after he repaid the construction lender.

---

[1] Unless otherwise indicated, the facts of the case are taken from the bankruptcy court's Findings of Fact. (Opinion at 2-12.)

On September 10, 2002, Dr. Siragusa loaned $100,000 to 1210 West Waveland LLC. He also directed the Robert J. Siragusa M.D. Employee Trust, his pension plan ("Plan"), to lend $200,000 to the same entity. 1210 West Waveland LLC issued promissory notes to Dr. Siragusa and the Plan. The notes required the LLC to make payments periodically from the net proceeds of the sale of the condo units, after the construction lender was repaid, with a final maturity date independent of the sales.

On September 26, 2002, Dr. Siragusa made a $60,000 loan and the Plan a $140,000 loan to 2801 Seminary LLC. On June 3, 2003, Dr. Siragusa made a $50,000 loan and the Plan a $145,000 loan to 643 Barry LLC. On November 12, 2003, Dr. Siragusa made a $50,000 loan and the Plan a $65,000 loan to 1300 Eddy LLC. Dana Siragusa, Dr. Siragusa's older daughter, made a $20,000 loan to 1300 Eddy LLC. These LLCs all issued promissory notes in substantially the same form as the Waveland notes.

In late 2003, Collazo and Goldman began to transfer unsold condo units out of the borrower-LLCs into other LLCs they owned, and they granted new mortgages on the transferred units to new lenders. On December 4, 2003, 1210 West Waveland LLC transferred the three remaining unsold units in the Waveland development to Art–Man Investments LLC ("Art-Man"), of which Collazo and Goldman were the sole members. On April 19, 2004, 643 Barry LLC transferred three unsold units in the Barry development to Art–Man. 2801 Seminary LLC transferred its interest in an unsold unit to GoCo Investments LLC ("GoCo") on September 24, 2004. Art-Man and GoCo granted new mortgages on the units to Cole Taylor Bank and Rainbo Assets in exchange for additional loans.

As Goldman explained at trial, the purpose of these transfers was to create a "liquidity event." Once the condos were transferred to entities with clean balance sheets, Collazo and

Goldman could take out new loans, using the transferred condo units as collateral, in order to make payments to investors as they came due or pay off any outstanding construction debts that might prevent units from being sold. (Trial Tr. at 238-40.) Collazo testified that he never had any intention, at the time the notes held by the Siragusas were made, to transfer unsold units to other entities in order to generate additional financing.

On June 30, 2004, 1210 West Waveland LLC fully paid its notes to Dr. Siragusa and the Plan, eight months past due. On December 11, 2004, 2801 Seminary LLC made a partial payment of $110,000 on its notes, also eight months past due. When, in early 2005, with the Seminary notes still only partially paid and the Barry and Eddy notes in default, Dr. Siragusa sought an update from Collazo, Collazo told him that the developments had encountered construction delays.

On May 16, 2005, one of the Eddy units sold (unbeknownst to Dr. Siragusa), but none of the proceeds were applied to the Eddy notes. On July 1, 2005, 1300 Eddy LLC transferred three unsold Eddy units to PRJ Properties ("PRJ"), another Collazo and Goldman entity, and PRJ granted a new mortgage to Cole Taylor Bank. By July 2005, all of the unsold units in the buildings in which the Siragusas had invested had been transferred to business entities that owed no legal obligations to the Siragusas, and Collazo and Goldman had mortgaged the units to obtain additional loans.

In the fall of 2005, Collazo and Goldman spoke with Dr. Siragusa about loans for a new development in Arizona. (Trial Tr. at 42.) According to Dr. Siragusa, Collazo and Goldman stated that the outstanding loans related to the Chicago properties would be repaid after the remaining condo units were sold, and they expected all remaining units to sell in the next 30 to 60 days. They did not disclose that the remaining units had been transferred to entities that owed

no debt to the Siragusas, that these units were still encumbered by mortgages, or that proceeds from the sales of some units had been diverted to other investments rather than used to make payments on the Siragusas' notes. Dr. Siragusa asked if some of his children could invest in the project, and Collazo assented. (*Id.* at 44-45.) On November 22, 2005, CG Development LLC, another Collazo/Goldman entity, issued an $800,000 note to the Plan and a $200,000 note to Dana, Julie and their brother, Robert Joseph, in exchange for loans to finance the Arizona project. Both notes promised 20% interest and matured in November 2007.

Over the next several years, Collazo sold off the remaining Chicago condo units, but, due to the vast mortgage debt that had accumulated, the sales yielded either no net proceeds or only a fraction of what the Siragusas were owed, and no payments were made to the Siragusas. Julie testified that she brokered the sale of the last of the Eddy units in July 2007, and she called her father to celebrate. Dr. Siragusa, however, seemed irritated by the news, telling Julie that he was invested in that building and she needed to tell him when the Eddy units were sold.

The Arizona notes matured on November 27, 2007, but no payment was made. The following summer, Dana, a practicing attorney, began communicating directly with Collazo and Goldman regarding repayment of the outstanding debts. In January 2009, Dana received a settlement proposal that provided for payments from the sale of condo units. Dana was alarmed to discover that the proposal referred to units in buildings the Siragusas had not invested in. Looking into the matter more deeply, Dana discovered that the borrower-LLCs had transferred all their units to other entities and the units had already been sold.

The Siragusas continued to pursue a settlement with Collazo, and they attempted to negotiate a forbearance and tolling agreement with him, but they never entered into any such agreement. Collazo filed for Chapter 7 bankruptcy on November 7, 2012, and the Siragusas filed

proofs of claim for fraud and contractual debts under the promissory notes. The Siragusas then filed this adversary proceeding to determine whether their claims were non-dischargeable under 11 U.S.C. § 523(a)(2)(A) because they were based on debts for money obtained by false pretenses, false representation or fraud. The bankruptcy trustee filed a report of no distribution, and the bankruptcy case was closed on December 20, 2013, although the bankruptcy court had not yet issued a ruling on the Siragusas' adversary proceeding.

## PROCEDURAL HISTORY

The bankruptcy court held a trial in this adversary proceeding in October 2013, and it issued an order on March 5, 2014. The court determined that the claims related to the loans to the Seminary, Barry and Eddy LLCs (hereafter, "the Chicago loans") were dischargeable because, at the time the loans were made, Collazo had no intent to transfer the units out of the borrower entities or take any other action to prevent the Siragusas from collecting on the notes, and his representations to Dr. Siragusa were therefore not false or fraudulent. (Opinion at 6-7, 19.) The court observed that Collazo paid the Waveland notes even after all remaining Waveland units had been transferred out of the 1210 West Waveland LLC, rendering the entity judgment-proof. (*Id.* at 7.) The court concluded that, as they had testified, Collazo and Goldman transferred the units out of the borrower-LLCs to generate additional financing in response to slow sales, not to carry out a fraudulent design. (*Id.* at 6-7.)

However, the court found that Collazo obtained the loans to CG Development LLC for the Arizona project (hereafter, "the Arizona loans") based on false representations, as Collazo knew at the time the loans were made, contrary to his representations to Dr. Siragusa, that the Chicago loans would not be repaid within 30 to 60 days of the sale of the remaining Chicago units. (*Id.* at 19-20.) By that time, the properties had been encumbered with vast mortgage debt,

and Collazo knew or should have known that the sales of the remaining units would not generate proceeds sufficient to pay the Siragusas in addition to the mortgage lenders, who had superior rights to repayment. (*Id.* at 20.) Further, an Eddy unit had already sold by that time, and Collazo had made no payment on the Eddy notes. (*Id.*) It was clear he had no intention of doing so, and all the elements of fraud were met. (*Id.* at 21-22.)

Nevertheless, the court found that Collazo had a defense to the Arizona fraud claims because the statute of limitations began to run as to Julie and Dr. Siragusa not in 2009, as the Siragusas argued, but in July 2007, when Julie called Dr. Siragusa to tell him she had sold another Eddy unit. (*Id.* at 16.) By that time, according to the court, Dr. Siragusa and Julie had information that would motivate a reasonable person to investigate more deeply. (*Id.*) The statute of limitations, which is five years under Illinois law, 735 Ill. Comp. Stat. 5/13-205, had run by the time Collazo filed for bankruptcy in November 2012. (*Id.* at 18.) The court held that the claim based on the $800,000 debt to the Plan was dischargeable, but Dana and Robert Joseph's claims based on the $200,000 note were non-dischargeable because the statute of limitations did not begin to run as to them until 2009. (*Id.* at 22.)

The parties filed post-trial cross-motions to amend the judgment. The Siragusas contended that (1) a money judgment should have been entered on the portion of the debt that was determined to be non-dischargeable, (2) there was sufficient proof that the Chicago loans were based on a misrepresentation, (3) the statute of limitations should not have been applied to the Arizona loan, regardless of when it began to run, because Collazo never argued that the claims based on the Arizona loan were time-barred, and (4) the statute of limitations was misapplied because the July 2007 conversation with Julie did not give Dr. Siragusa reasonable notice of wrongdoing that would trigger the statute. Collazo contended that Dana and Robert's

claims should also have been time-barred because Dr. Siragusa's knowledge should have been imputed to them. The court denied the post-trial motions. (Bankruptcy No. 12 B 44342, Adversary Proceeding 13 A 000216, Dkt. 105, Order Denying Motions to Amend Order ("Supplemental Order").) These cross-appeals followed.

## I. THE SIRAGUSAS' APPEAL

### A. Whether Money Damages Should Have Been Awarded

The Siragusas claim that the bankruptcy court should have entered a money judgment in favor of Dana and Robert Joseph. In their post-trial motion, Dana and Robert Joseph sought a money judgment of $1,076,032.36, the amount due on the November 22, 2005 Arizona note, which represents the $200,000 principal amount of the note plus accumulated interest, calculated according to the terms of the note (Plaintiff's Trial Exhibit 52). In the Siragusas' view, by denying Dana and Robert Joseph's motion for entry of a money judgment, the bankruptcy court forced Dana and Robert Joseph to litigate a new action in state court in order to obtain damages on their fraud claim, and this duplication of effort offends notions of fairness and judicial economy.

Collazo claims that the court properly declined to enter a money judgment because (1) it had no jurisdiction to do so under *Stern v. Marshall*, 134 S. Ct. 2594 (2011), which held that state law claims, even if related to bankruptcy matters, must be adjudicated by an Article III court, and (2) even if there was jurisdiction, it was not an abuse of discretion to decline to award money damages.

### 1. Whether the bankruptcy court erred by declining to enter a money judgment

It is uncertain in this circuit, in the wake of *Stern*, whether a bankruptcy court has jurisdiction to enter a money judgment on a state-law claim, such as the Siragusas' fraud claims,

in a dischargeability proceeding.  The Seventh Circuit stated in an unpublished decision that "it is unclear whether *Stern* . . .  restricts a bankruptcy court's power to resolve a creditor's state-law claim when the court decides whether that claim is nondischargeable."  *Lee v. Christenson*, 558 F. App'x 674, 676 (7th Cir. 2014).  Some lower courts have concluded that *Stern* imposes no such restriction, *see In re Boricich*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011), but others have concluded that it does, *see In re Wood*, 503 B.R. 705, 709-10 (Bankr. W.D. Wis. 2013); *In re Strauss*, 523 B.R. 614, 624 (Bankr. N.D. Ill. 2014).

In light of this uncertainty, the bankruptcy court decided, in the exercise of its discretion, not to enter a money judgment that might later be found to have been entered without jurisdiction.  (Supplemental Order at 2-3.)  This Court finds nothing improper in this decision.  Even if the bankruptcy court had jurisdiction to enter a money judgment, it was not required to do so; it was well within the court's discretion to opt simply to determine that the debt is non-dischargeable without entering a money judgment.  *See Nat'l Bank v. Buckley (In re Buckley)*, Bankruptcy No. 08-80409, Adversary Proceeding 08-8063, 2009 WL 400628, at *3 (Bankr. C.D. Ill. Feb. 17, 2009); *see also In re Sasson*, 424 F.3d 864, 874-75 (9th Cir. 2005).  The bankruptcy court did not err in this respect.

### 2.  Whether this Court should enter a money judgment itself

The Siragusas further argue, however, citing *Executive Benefits Insurance Agency v. Arkison*, 134 S. Ct. 2165 (2014), that even if this Court declines to reverse and remand the case to the bankruptcy court for entry of a money judgment, this Court can and should enter a money judgment itself.  The bankruptcy court declined to enter a money judgment because it doubted whether it could constitutionally enter a money judgment on a state-law fraud claim under *Stern*,

as explained above, and it doubted whether it had statutory subject matter jurisdiction to enter a

money judgment under the Bankruptcy Code:

> [Under 28 U.S.C. § 1334, a] district court has jurisdiction over all proceedings
> arising under title 11, or arising in or related to cases under title 11.  Nothing in 11
> U.S.C. § 523(a)—which limits the scope of a debtor's discharge—gives the
> bankruptcy court the authority to enter money judgments against the debtor,
> payable from the debtor's non-estate assets.  Furthermore, because the entry of
> monetary judgment against a post-discharge debtor has no effect on distribution
> of the bankruptcy estate, it is not related to a case under title 11.  Bankruptcy
> jurisdiction, the Seventh Circuit has said, "extends no farther than its purpose,"
> which is "to provide a single forum for dealing with all claims to the bankrupt's
> assets." *Elscint, Inc. v. First Wis. Fin. Corp. (In re Xonics, Inc.)*, 813 F.2d 127,
> 131 (7th Cir. 1987).

(Supplemental Order at 2.)  The Siragusas contend that the bankruptcy court's *Stern* concerns,

even if valid, are not applicable in this Article III court.  Further, unlike the bankruptcy court,

this Court can exercise supplemental jurisdiction over claims factually related to the non-

dischargeability claim and enter a money judgment on them, even if such claims are not "related

to" the bankruptcy case in the sense that they might have some effect on the distribution of the

bankruptcy estate.  *See Rahl v. Bande*, 316 B.R. 127, 132 (S.D.N.Y. 2004); *In re Ha-Lo Indus.,*

*Inc.*, 330 B.R. 663, 672-73 (Bankr. N.D. Ill. 2005); *In re Conseco, Inc.*, 305 B.R. 281, 286

(Bankr. N.D. Ill. 2004) (citing *Wieboldt Stores, Inc. ex. rel. Raleigh v. Schottenstein*, 111 B.R.

162, 166-67 (N.D. Ill. 1990)).[2]

Collazo contends in response that the bankruptcy court did not make sufficient findings

to liquidate Dana and Robert Joseph's claims:

---

[2] These cases notwithstanding, one commentator has argued, in a seminal article, that district courts have no
supplemental jurisdiction in bankruptcy cases, *see* Susan Block-Lieb, *The Case Against Supplemental Bankruptcy
Jurisdiction: A Constitutional, Statutory and Policy Analysis*, 62 Fordham L. Rev. 721 (1994), and some courts, all
citing Block-Lieb's article, have recognized the uncertainty surrounding the issue, *see Chapman v. Currie Motors,
Inc.*, 65 F.3d 78 (7th Cir. 1995); *In re Walker*, 51 F.3d 562, 572-73 (5th Cir. 1995); *Conseco*, 305 B.R. at 28.  Most
courts, however, have held that district courts can exercise supplemental jurisdiction in bankruptcy cases, *see Rhiel
v. Cent. Mortg. Co. (In re Kebe)*, 444 B.R. 871, 879-80 (Bankr. S.D. Ohio 2011) (citing cases), and this Court will
follow these decisions.

> The debt owed to Dana and Robert Joseph is evidenced by a promissory note dated November 22, 2005 made . . . to Dana, Julie, and Robert Joseph Siragusa in the amount of $200,000. The Bankruptcy Court found that the debt owed to Julie was barred by the applicable statute of limitations and Julie has not appealed that ruling. Accordingly, [a] court will have to determine the actual dollar amount of loans made by Dana and Robert Joseph which are evidenced by this $200,000 note. The Plaintiffs neither introduced evidence at trial as to the amounts which were purportedly loaned by Dana and Robert Joseph nor did the Bankruptcy Court make a determination as to what portion of the $200,000 was actually loaned by these individuals.

(Br. and Arg. of Appellee and Cross-Appellant at 6.) It is true that the record was not developed to support a money judgment,[3] and this Court agrees with Collazo that the record is presently inadequate to liquidate Dana and Robert Joseph's state-law fraud claims. It is unclear what amounts Dana, Julie and Robert Joseph each contributed to the $200,000 loan,[4] and it is therefore impossible, on the present record, to determine how to calculate damages.

If, in the present action, the Siragusas were suing to enforce the note itself, perhaps the $1,076,032.36 figure that they submit, based on the amounts due on the note in principal and interest, would be the proper measure of damages. However, the claims presently at issue are Dana and Robert Joseph's claims that Collazo committed *fraud* by making false representations that induced them to make a loan, evidenced by the note, to Collazo's business entity. In Illinois, damages for fraud are limited to the out-of-pocket loss to the plaintiff, based on the rationale that the plaintiff is entitled to be placed in the same financial position he would have been if he had not been defrauded. *Martin v. Allstate Ins. Co.*, 416 N.E.2d 347, 352 (Ill. App. Ct. 1981). Before the Court can enter a money judgment in favor of Dana and Robert Joseph, it must

---

[3] The bankruptcy court stated explicitly in its Opinion that "[t]his adversary proceeding is limited to the determination of dischargeability. It does not implicate *Stern v. Marshall*." (Opinion at 13.) In other words, the bankruptcy court tried the case under the impression that no state-law claims were directly at issue because this case was purely an adversary proceeding to determine whether certain debts were non-dischargeable under § 523(a)(2)(A).

[4] Julie may have been a lender in name only. She testified at trial that, at least originally, her brother and sister made her contribution for her, at their father's direction, but counsel interrupted her before she finished her answer, and it remains unclear whether she ever paid them back. (Trial Tr. at 362.)

determine what amounts they actually paid; if Julie contributed some portion of the loan, and the Court enters a money judgment on the entire $200,000, plus interest, without making any adjustment to account for the fact that Julie's share is not recoverable because her claim is barred by the statute of limitations, Dana and Robert Joseph will receive a windfall.

Further, in a case in which the plaintiff was fraudulently induced to make a loan, damages for the out-of-pocket loss may be increased by the amount of interest that the plaintiff may have been able to earn from an "alternative use" of the money. *Fed. Deposit Ins. Corp. v. W.R. Grace & Co.*, 877 F.2d 614, 623 (7th Cir. 1989); *see also Commercial Nat. Bank of Peoria v. Fed. Deposit Ins. Corp.*, 476 N.E.2d 809, 815 (Ill. App. Ct. 1985). The $1,076,032.36 figure the Siragusas have proposed, based on a principal amount of only $200,000, has apparently been calculated based on the exorbitant 20% and, after default, 25% rates of interest dictated by the terms of the note, which allowed enormous amounts of interest to accumulate over years of default. Other investments may have yielded lesser, more reasonable rates of return, so Dana and Robert Joseph's proposed damages, even assuming that they actually paid the whole $200,000 principal amount themselves, may not put Dana and Robert Joseph in the position they would be in if they had made an "alternative use" of the money.

In short, to enter a correct and proper money judgment on Dana and Robert Joseph's claims, this Court would have to hold further proceedings to receive new evidence and argument, or remand to the bankruptcy court so that it might hold further proceedings and submit proposed findings of fact and conclusions of law to this Court.

But Collazo's bankruptcy proceedings are otherwise completely and entirely concluded, and, as the bankruptcy court stated in its Supplemental Order, there is no pending claim with independent federal jurisdiction. The bankruptcy court had jurisdiction of this case under 11

U.S.C. § 1334, which gives district courts (and by reference, bankruptcy courts) jurisdiction over all proceedings arising under title 11, or arising in or related to cases under title 11. (Supplemental Order at 2.)  A district court has jurisdiction over core bankruptcy proceedings, such as this adversary proceeding to determine non-dischargeability under 523(a), because it "arises under" title 11, and it may have jurisdiction over state-law claims, such as a state-law fraud claim, that are "related to" the bankruptcy case, but "because the entry of monetary judgment against a post-discharge debtor has no effect on distribution of the bankruptcy estate, it is not related to a case under title 11." (Supplemental Order at 2 (citing *Elscint, Inc.*, 813 F.2d at 131).  Thus, this Court has jurisdiction to enter a money judgment only if it exercises its supplemental jurisdiction under 28 U.S.C. § 1367.

However, a case in which "the federal claim is resolved one way or another while the supplemental state-law claims are pending, unresolved," is "an attractive case for the court, in the exercise of discretion conferred by section 1367, to relinquish its jurisdiction over them to the state courts, especially if the federal claim has . . . been resolved without a trial." *See Townsquare Media, Inc. v. Brill*, 652 F.3d 767, 772 (7th Cir. 2011).  In this case, the federal claim was not resolved "without a trial," but, because the Court needs to receive additional evidence and perhaps briefing to proceed, this case is the functional equivalent of a case in which the federal claims were dismissed or resolved prior to trial, not a case that has "proceeded through one court system and is almost finished with there." *Chapman v. Currie Motors, Inc.*, 65 F.3d 78, 81 (7th Cir. 1995).

In *Shapiro v. United States (In re Shapiro)*, 188 B.R. 140, 148-49 (Bankr. E.D. Pa. 1995), the court made a similar analogy and reached a similar conclusion when, in a post-discharge adversary proceeding stemming from a no-asset Chapter 7 bankruptcy, like this proceeding, it

declined to liquidate the debtor's non-dischargeable tax debt and opted instead to relinquish jurisdiction because only non-bankruptcy law issues remained in the case. *Shapiro* cited *Chapman v. Currie Motors, Inc.*, 65 F.3d 78, 82 (7th Cir. 1995), in which the Court held that, "the bankruptcy proceeding having ended, the adversary proceeding became a dispute of no interest to anyone except the two adversaries, and their dispute revolved entirely around [an issue of state law]. There was not even a remote federal interest."

As in *Chapman* and *Shapiro*, the interests of bankruptcy law are not served by the exercise of supplemental jurisdiction over the state-law fraud claim because the outcome of the proceeding will not affect the distribution of property in the bankruptcy estate. (Supplemental Order at 2.) Collazo's bankruptcy was a no-asset Chapter 7 case; *i.e.*, the trustee reported that he made no distributions to creditors on behalf of the estate because he found no non-exempt property to distribute. (*In re Collazo*, Bankruptcy No. 12 B 44342, Ch. 7 Trustee's Report of No Distribution, Dkt. No. 59 (Bankr. N.D. Ill. Dec. 20, 2013).) Under such circumstances, any post-discharge liquidation of a non-dischargeable debt can affect only assets of Collazo that were exempt from the bankruptcy estate by law or were acquired post-bankruptcy. There is simply no federal interest dictating that this Court should exercise jurisdiction over Collazo's disposition of these assets, and that makes this "an attractive case for the court to relinquish its jurisdiction to the state courts." *Townsquare Media*, 652 F.3d at 772; *see Shapiro*, 188 B.R. at 148; *Buckley*, 2009 WL 400628, at *3-4.

To be sure, the parties' interests in judicial economy and fairness deserve consideration. However, considering that further proceedings will be necessary to liquidate Dana and Robert Joseph's fraud claims whether this Court takes on that task or leaves it to a state court, any time that may be saved by holding further proceedings here rather than in state court is slight, and in

the circumstances of this case, the interest of judicial economy does not outweigh the interest in leaving questions of state law to the state courts. Like the bankruptcy court, this Court declines to enter a money judgment in favor of Dana and Robert Joseph.

### B. Whether The Chicago Loans Were Based On Fraudulent Representations

The Siragusas next contend that the bankruptcy court erred by finding that the Chicago loans were not based on a fraudulent representation because Collazo's alleged misrepresentation—that he would pay the notes with the proceeds from the sale of the condo units after he had repaid the construction lender, without mention of the fact that the remaining condo units would be transferred and mortgaged—was not false at the time it was made. According to the Siragusas, Collazo's very act of transferring the units out of the borrower-LLCs and mortgaging them again revealed his misrepresentations to be part of a fraudulent scheme. According to Collazo, the bankruptcy court correctly found that Collazo's conduct after the Chicago loans were made was merely an attempt to generate additional financing in response to slow sales, not evidence of a fraudulent design or scheme.

The bankruptcy court's finding was not clearly erroneous. As the bankruptcy court explained in its Opinion, Collazo paid the Waveland notes in full several months after he had already made the 1210 West Waveland LLC judgment-proof by transferring the remaining unsold condos out of the borrower-LLC. (Opinion at 7.) This conduct was strong evidence that Collazo borrowed money from the Siragusas in good faith, with the intent to repay the loans, and where he failed to do so, it was only because his condos did not sell as well and as fast as he had anticipated. The bankruptcy court did not err and its decision is affirmed in this respect.

15

### C. Whether Statute of Limitations Had Run as to Arizona Loan

The Siragusas contend that the bankruptcy court erred by holding that the statute of limitations had run as to Dr. Siragusa's claim arising out of the Arizona loan because Dr. Siragusa's conversation with Julie in July 2007 would not have alerted a reasonable person to the possibility of fraud. Collazo had made late payments before, on the Waveland and Seminary notes, and, according to the Siragusas, the mere fact that Collazo did not pay promptly after some of the Eddy units sold would not necessarily have indicated to a reasonable person in Dr. Siragusa's position that no payment was forthcoming because Collazo had defrauded him.

This argument twists the facts. In the fall of 2005, in pitching the Arizona loan to Dr. Siragusa, Collazo specifically stated that he expected the remaining Chicago units to sell in 30 to 60 days, with payment to follow soon after. While it is true that the Waveland notes were paid eight months after they matured, and the partial payment on the Seminary notes was eight months late as well, the Eddy notes had been in default for more than two years in July 2007. A reasonable person learning in July 2007 that the last Eddy unit had just sold (Trial Tr. at 342-43), when he had been given assurances that all units would have been sold a year and a half ago and that he would be paid promptly from the proceeds of each sale, as the terms of the notes required, would have been on notice that something was amiss. The bankruptcy court did not clearly err, and its decision is affirmed in this respect.

## II.  COLLAZO'S CROSS-APPEAL

### A. Whether the Court Erred in Imputing Knowledge to Dana and Robert Joseph

On cross-appeal, defendant contends that neither Dana nor Robert Joseph had any valid fraud claim against Collazo based on the Arizona loan because the evidence did not show that either attended the November 2005 meeting or heard the misrepresentations Collazo allegedly

16

made; rather, Collazo made the alleged misrepresentations to Dr. Siragusa, who asked if his children could invest in the Arizona project with him. According to Collazo, the bankruptcy court's ruling must necessarily have been based on an implicit finding that Dr. Siragusa acted as Dana and Robert Joseph's agent by investing in the Arizona development for them, and as their agent, his knowledge was imputed to them for purposes of their fraud claim.

It would follow, Collazo argues, that if Dr. Siragusa's knowledge could be imputed to Dana and Robert Joseph for purposes of their fraud claims against Collazo, the knowledge Dr. Siragusa acquired during his July 2007 phone call with Julie must also be imputed to them. When he learned facts that would have spurred a reasonable person to investigate the possibility of fraud and the statute of limitations began to run as to him, the statute of limitations must also have begun to run as to Dana and Robert Joseph, and, consequently, it must have expired before Collazo filed for bankruptcy. Collazo submits that the bankruptcy court must have erred either in imputing knowledge of Dr. Siragusa's November 2005 conversations with Collazo to Dana and Robert Joseph, or it erred in failing to impute knowledge of Dr. Siragusa's July 2007 conversation with Julie to Dana and Robert Joseph; the bankruptcy court cannot have been correct in both instances.

The Siragusas respond that the premise for Collazo's argument is incorrect: the bankruptcy court did not rely on any implicit finding of agency, nor did its decision require any such finding, because Collazo expected his representations to reach Dana and Robert Joseph and influence their decision-making. The Court agrees. Fraudulent representations extend not only to people to whom they were made directly, but also to any person they might reasonably have been expected to reach, so long as the misrepresentations actually reach the person and influence his action. *St. Joseph Hosp. v. Corbetta Constr. Co., Inc.*, 316 N.E.2d 51, 72 (Ill. App. Ct. 1974).

Dr. Siragusa specifically asked Collazo whether his children could invest in the Arizona project, and Collazo assented; Collazo could certainly have reasonably expected his representations to reach the Siragusa children. Dana testified that she invested in the project after speaking with her father and she would not have invested if she had known what Collazo failed to tell her father: that the Chicago properties had been transferred out of the borrower-LLCs and mortgaged so that there would be no proceeds left for the Siragusas after repaying the mortgage lenders. (Trial Tr. 106-07.) His misrepresentations demonstrably did extend to her. *See St. Joseph Hosp.*, 316 N.E.2d at 72, *Hirsch v. Optima, Inc.*, 920 N.E.2d 547, 562-63 (Ill. App. Ct. 2009).

Although, unlike Dana, Robert Joseph did not testify, this Court does not find the bankruptcy court's inference that Collazo's misrepresentations similarly extended to Robert Joseph to have been clearly erroneous. *See Kramer v. Am. Bank & Tr. Co., N.A.*, 989 F. Supp. 2d 709 (N.D. Ill. 2013) ("Neither juries nor judges are required to divorce themselves of common sense, but rather should apply to facts which they find proven such reasonable inferences as are justified in light of their experience as to the natural inclinations of human beings."); *Yamada v. Hilton Hotel Corp.*, 376 N.E.2d 227 (Ill. App. Ct. 1977) ("Only when there is a complete absence of probative facts supporting an inference can it be said that such inference is clearly unreasonable."). The Siragusas proved that Collazo induced Dr. Siragusa to invest in the Arizona project by telling him that the past-due Chicago loans would be repaid within 30 to 60 days, without telling him that the units in the Chicago developments had been mortgaged so heavily that the sales of these units could not have generated enough money to pay the mortgage lenders as well as Dr. Siragusa. Dr. Siragusa specifically asked Collazo if his children could invest in the Arizona development as well. (Trial Tr. at 44.) Dana testified that she invested

based on her conversation with her father.[5] (*Id.* at 126.)  Julie testified that Robert Joseph paid a

portion of her share of the loan, at their father's direction.  (Trial Tr. at 362.)  From these facts

flows the clear inference that Robert Joseph, like Dana, invested based on the recommendation

of his father, and his father's recommendation was influenced by Collazo's fraudulent

misrepresentations and omissions to him.  There is no failure of proof of fraud under these

circumstances.  *See Edalatdju v. Guaranteed Rate, Inc.*, 748 F. Supp. 2d 860, 864-66 (N.D. Ill.

2010); *Zivitz v. Greenburg*, No. 98 C 5350, 1999 WL 984397, at \*8-9 (N.D. Ill. Oct. 25, 1999)

(both recognizing possibility of inferring plaintiff's reliance on defendant's misrepresentations).

Finding that Dana and Robert Joseph had valid fraud claims against Collazo did not

require any implicit finding that Dr. Siragusa was their agent, nor is there any other basis in the

record for any conclusion that Dr. Siragusa was Robert Joseph and Dana's agent.  There is no

basis for imputing to Dana and Robert Joseph the knowledge that triggered the running of the

statute of limitations as to Dr. Siragusa.  Collazo's contentions are without merit, and the

bankruptcy court did not err.

### B. Whether The Agency Issue Was Properly Raised In Collazo's Post-Trial Motion

Even if Collazo were correct that the bankruptcy court erred either in imputing Dr.

Siragusa's knowledge to Dana and Robert Joseph or in failing to apply the statute of limitations

to them because Dr. Siragusa was their agent, the bankruptcy court did not err in refusing to

consider Collazo's agency argument, which was first raised in a post-trial motion.  Collazo

contends that it could not possibly have raised the argument earlier because it was prompted by

what he views as an internal inconsistency in the bankruptcy court's ruling, as described above.

---

[5] Dana's conversations with her father were so influential that she did not even bother to read some of the documents she signed in connection with the loan; she testified that she merely relied on the representations made to her father.  (Trial Tr. at 126.)

Again, as explained above, there is no inconsistency in the bankruptcy court's ruling. Even if there were, this Court fails to see why Collazo could not have raised this argument earlier. As the Siragusas state in their brief, "Collazo argued in the Bankruptcy Court that the Statute of Limitations applied to Dr. Siragusa's loans. He could have but did not make the agency argument as to Dana and Robert Joseph's loans." (Reply Br. of Pls.-Appellants at 6.) The Court agrees. That it merely did not occur to Collazo to raise the argument until after he saw the bankruptcy court's order does not mean that he could not have made the argument before seeing the order. The bankruptcy court did not err in declining to address a new legal issue not raised until after trial.

## CONCLUSION

For the reasons set forth above, the Court affirms the bankruptcy court's judgment.

**SO ORDERED.**

                **ENTERED: May 19, 2015**

                **HON. JORGE L. ALONSO**
                **United States District Judge**